Okay, our third case this morning is number 14-12-30, In Re Engleman, Ms. Venker, is that it improperly disregarded the differences between the primary prior art reference, Bolen, and the composition of Claim 35, most significantly ignoring the progressing tumor burden limitation. You appear to be suggesting that taking the dendritic cells from a patient with a tumor would lead people to think that you wouldn't be able to manipulate those dendritic cells in vitro. What's the basis for that? What evidence is there in the record that was before the board that suggests that that would make a difference? I want to make sure I understand your question, your honor. That taking dendritic cells from a patient with a tumor would not work, would not allow them to be activated in vitro? Correct. I think there was a question as to whether or not that was the case. Based on what? Based on tumor-induced immunosuppression. It was well accepted in the industry that... No, but I'm sorry, I want specific references in the record. Where in the record is there evidence that there was doubt that that would work? If we look, starting with the specification, your honor, at JA54, line 34, through JA55, line 6, it says, quote, in vivo, so as to not function in a manner similar to that of T-cells obtained from tumor immune hosts. Okay, so that says may, and it also doesn't cite anything. I mean, I don't think that the fact that the specification says something is itself evidence of a fact. What references, what affidavits, what declarations say that this would make a difference? So in January of 1996, very close in time to the December 1995 filing of the instant specification, the commentary authored by Young and Inaba, that's found at JA1629. That's the thing that wasn't in the record before the board, right? Your honor, we believe that it was. We cited it in our appeal brief to the board, in the background section, because it dealt with the landscape of the technology. So the board has to consider everything you cited in the background section, even though you didn't argue based on that reference? Well, we did argue with respect to the art. We, in fact, said at JA1262 in our brief, these authors being Young and Inaba, evidence no expectation of success that dendritic cells would work as a therapeutic cancer vaccine. That's obvious in this language. Where are you referring to? JA1262, our appeal brief. I'm sorry. Yes, JA1262, you'll see there's a site in the middle of that page to the Young and Inaba article. And the last sentence in that paragraph said, these authors evidence no expectation of success that dendritic cells would work as a therapeutic cancer vaccine, nor that these cells were the choice most likely to be successful and therefore obvious to try. I'm sorry, where is this on the page? So JA1262, just below the indented quote, it's the second sentence down. It's the last sentence in that paragraph. Okay, but there's no suggestion that it wouldn't work, right? Just that it hadn't yet been established. Is that fair? That the cells from someone with, there was skepticism, Your Honor. Right, it was untested. No one had done the work. Well, there's a difference between it won't work and skepticism and it's yet to be proven or untested. I mean, the suggestion that it's untested seems to me to lead to the obvious conclusion that somebody should test it. Somebody should test it, but they had no expectation that even if they were, I think your hypothetical was activated outside the body. So there was a question as to whether that would succeed, but then even a further question as to what Engelman claims, which is that then when put back into the body, that they could activate T cells in vivo. There was great skepticism as to that, even a year and a half after Engelman had actually... But you say great skepticism, which, as Judge Hughes points out, is really not supported by this. What they're saying is, we don't know. Saying we don't know is not the same thing as being skeptical about it. Well, one... I take your point, Your Honor, that skepticism is a subjective word, but Young and Inaba did say, after citing to a paper that... I think the timeline's important, if I could digress for just a moment. The Engelman specification to which we claim priority was filed in June of 1994. The CIP, that's the instant specification, was filed in December of 1995. It added some things we aren't claiming to HIV and such. So this invention was made and filed in June of 1994. That's not contested, but it was confidential. The world didn't know about it. So in December of 1995, the instant specification was filed. In January of 1996, Young and Inaba wrote this commentary about the state of dendritic cells. They commented on three other articles that were published in the same issue of that journal, one of which had worked with mice that had tumors, but they were called small-but-existent tumors. That was not prior arcs. That was published in January of 1996, but even after having seen that, Young and Inaba said, several precautions are warranted. First, these are all mirroring tumor models. It has yet to be proven that human dendritic cells present tumor antigens and illicit specific T-cell immune responses, even in vitro. This is what those at the top of their game said. James Young was in the same lab as... Well, if it had been proven, it would be anticipated. So it can't be required that it be proven to be obvious, right? Yes, Your Honor, I believe that's true. But they had no... To be obvious, there should be an expectation of succeeding. And with all of these folks saying that it's untested, they also said... Is that a legal requirement for our obviousness test, that there be an expectation of succeeding, or just a motivation to combine and try it? There should be either. So you could have a motivation, teaching, or suggestion. The reference you're talking about, where it talks about it hasn't been proven yet and it hasn't been tested, itself suggests a motivation to test it. You're clearly not arguing that this teaches a weapon. Well, there are some... Or are you? Are you saying that because nobody's proven this and it's untested, that that teaches a way for doing your method? No, but there are items in the record that do teach a way. What teaches a way? Two things teach a way. One is Yangananaba itself. If we look at the record at page 1630, at the end of their paper, they talk about an obvious strategy. Let's see if I can find it. So there are two columns at the top of 1630. If we look at the left-hand one and the second paragraph that starts with, among the remaining challenges, will be how to load dendritic cells with the correct antigens for stimulation of antitumoral immunity. The next sentence, the one I want to point your attention to, an obvious strategy in addition to the methods presented in this issue, is the transduction of genes encoding relevant proteins into dendritic cells as they divide. Transduction of genes would be an entirely different approach that Engelman didn't... Wait a second. How does this teach a way? Because it mentions a different approach? Yes, because in order for it to be... I don't understand how mentioning a different approach teaches a way from doing what was done here. To be obvious to try, there should be a clear path forward that the prior art has a consensus around. This and Kwok also, which said... What else do you have in terms of teaching a way besides this? In Kwok, which is at JA277, that was the paper that talked about... That did not use dendritic cells, but that's the one that talked about trying to get an immune response in a patient with a minimal... Who's in remission and talked about how to deal with vaccines. Kwok says, there may be considerable latitude for optimizing the immunogenicity of the vaccine by modifying its foreignness by molecular engineering and by using better immunologic adjuvants. Our point is that the signposts were going many different ways. That again, I don't see how that teaches a way from doing that. Frankly, doesn't it support the obviousness conclusion? I think around line 18 of the left-hand column, it says, if more potent vaccines can be formulated, then the approach can be extended to immunizations of patients with greater tumor. That's precisely the limitation you're complaining of that Kwok teaches to. It says, if more potent vaccines can be formulated, but the how one should do it with this molecular engineering with a different direction, because nobody thought to take dendritic cells from a patient with a progressing tumor burden and put them back into that same patient where the immune system was broken. It had not been functioning, and those cells may have been subject to the suppressor cells that would hurt their function. That's exactly what Kwok teaches, but not about dendritic cells. It talks about taking blood out, processing it in vitro, and putting it back in the patient, right? It does. The antibodies would go back in, not the cells. We're not using Kwok for the dendritic cells. It's using other references for the dendritic cells. It's just looking at Kwok to say, this kind of therapy can work in people with increasing tumor burdens, with stronger drugs, essentially. It says it might if you do a couple of things that Engelman didn't do. So it didn't point him toward it. It didn't give a teaching or suggestion or motivation to go into sick patients. I mean, it was a big deal to people in the art that people had, when they had tumors, that their immune system didn't work. I don't understand how it doesn't precisely say exactly that. It says if more potent vaccines can be formulated, then the approach can be extended to immunization with patients with greater tumor burdens. That's saying develop better drugs, and you can use it in patients with tumor burdens. Doesn't that precisely point somebody to do that? Which was the goal of all the research in this area, I would submit. But the only people who actually did it were Engelman. And as of 1996, the foremost researchers in the field thought that, I think the last sentence in Young and Inaba was after saying, knowing that Zietvogel et al. had had some success in mice with this, and they still said, it remains unclear whether dendritic cell immunization would induce immunity against established disease and hosts with high tumor burdens. And concludes in the last sentence, many of the issues still confronting the use of dendritic cells for cancer immunotherapy will require carefully planned human trials. Well, Engelman had already done it a year and a half earlier. In any event, the board did not rely on quark, your honor. The board said quark was unnecessary. Sure it did. It mentioned quark. It did mention it. But it specifically held that it was not necessary for its finding, for affirming the obviousness rejection. And I believe that's because they were operating in this in vitro environment where you don't have a progressing tumor burden. And they used the in vitro claim construction. So I don't think it's appropriate at this point when the board clearly said we do not need to rely upon quark to reach the obviousness rejection. It's improper for us to rely on quark in sustaining them when they discussed it? Even though they said, if they said that we don't have to rely on it, it's improper for us to say, well, we don't need to reach that question because relying on it leads to the obviousness result? I think that the question here is whether the board erred. And the board said we do not need to rely on quark. We don't rely on quark. And if we're looking at what the board did, I don't think it's We're going to say we don't rely on quark. It's on JA-19, just above the subheading secondary considerations. That last small paragraph says we are not persuaded by appellant's contentions regarding quark, which is not required to reach the requirements of the appellant's composition claim 35. Okay. Anything else? I'll give you two minutes for rebuttal. Thank you. May it please the court. Claim 35 is to a product and patentability is based on the product itself. There has to be something structurally or functionally different from that product of that product than what the prior art told Engelman to make. And here there's just no evidence that there's anything structurally or functionally different from what the prior art told Engelman to make. Judge Dyke, you asked the question about the progressing tumor burden and whether or not that would affect the ability of the skilled artisan to take these dendritic cells out of a person, manipulate them, put them back in. And the board answered that question. They found on JA-17 that there was no evidence, and I'm in the first paragraph here, about four lines down. Appellant's cell to provide persuasive evidence or reasoning to establish that dendritic cells isolated from any patient and post-in vitro will function differently from those isolated from a patient with a progressing tumor burden. So again, they're finding that there's nothing structurally or functionally different from Engelman's dendritic cells than from what the prior art told Engelman to make. And I'd like to turn to the immunosuppression argument. The problem with the immunosuppression argument is that it has nothing to do with this claim. This claim only requires T cell activation. It doesn't require anything downstream of that. And if I can explain, as we explain in our red brief in the background section, what these dendritic cells do is they travel to the lymph nodes where the inactive T cells are located and they bind to the T cells, they present antigen to the T cells, and in doing that, they turn an inactive T cell into an active T cell. That's all the claim requires. Now, after the T cells are activated, they can do many things. They can proliferate, they can travel outside the lymph nodes, they can do all kinds of things, but this claim does not cover that. In Engelman's briefing to the board, he specifically said this claim only requires T cell activation. It doesn't require any type of therapeutic use downstream of that. So, the immunosuppressive environment, if it exists, it only affects what happens downstream. So, it has nothing to do with this claim at all. Does this argument that you're making now rely on the conclusion that the preamble isn't also limited? The preamble is not limiting. My argument does not rely on that, but the preamble is not. Because the preamble at least talks about using this preparation in people with a progressing tumor burden, at least as far as I understand it, which is not very far, is what this whole immunosuppression environment is about. But again, so the progressing tumor burden, if that causes an immunosuppressive environment, there's no evidence that it actually affects the ability of dendritic cells to activate T cells. It only affects, and the only explanation that is in the record is in Engelman's specification. And this is at page A54, lines 34 through line 11. He says that immunosuppression may affect the ability of T cells to kill tumor cells. But again, that's downstream of the claim. He makes no suggestion or explanation at all that this immunosuppressive environment affects the ability of dendritic cells to activate T cells. Because dendritic cells are just dendritic cells. He doesn't say anything about them being ill-functioning in patients with a progressing tumor burden. Turning to Young and Inaba, they talk about the expectation of success, but they only talk about it in terms of a therapeutic vaccine. And again, this is a composition of cells. It's not required, and as they said in the briefing to the board, there's no requirement that there be a therapeutic use for these cells. In the skepticism that they rely on Young and Inaba for, the skepticism, looking at it most favorably to Engelman, is that there's skepticism in treating the sickest patients. Those patients with gross tumors or very high tumor burdens. But again, even Engelman didn't treat the sickest patients. When he talked about his patients with lymphoma, they all had low-grade B cell lymphoma. And this is at A62, lines 15 through 17. So even Engelman didn't treat the sickest patients that maybe there was some skepticism that you couldn't with these cancer vaccines. But again, turning to the claim, the claim is only to a product and not to a method of treating patients. Does Engelman ever show that healthy T-cells are different than the sick T-cells? The T-cells themselves? Well, the only thing he says in his specification are the suppressor cells, and maybe the suppressor cells somehow prevent the T-cells from killing the tumor cells. But again, this claim is not concerned with the activity of the T-cells. Again, that's downstream of the claim. This claim, at most, is only concerned with the ability of the dendritic cells to activate the T-cells. And again, there's no evidence in the record that these dendritic cells have any type of... that they don't function the same in a patient with a progressing tumor burden and a patient without a progressing tumor burden. And the board found that at A17. And then getting to the point about... well, Engelman was the first to prove that you could put these dendritic cells in a patient with a progressing tumor burden and that it would actually have some therapeutic use. And in our red brief, I think we explained in Pfizer versus Apotex that just because you were the first to prove that a composition had some property is not sufficient to make something that the prior art told you to make that was obvious into something that's all of a sudden not obvious. Turning to CWOC, I'll just mention briefly that the board did affirm the examiner's rejection over all the references. And this is at JA19, the very first sentence, where they say, the combination of Bolin, Austin, Inova, Markovits, and CWOC suggests a composition comprising antigen-presenting human dendritic cells. This last paragraph is where they are responding to the applicants... cancer vaccine in a method for therapeutically treating a patient. And they didn't find this persuasive, again, because this claim is not to a method of treating a patient. It's just to a composition of cells. Unless the court has any further questions, I'll rest on my leave. Okay. Thank you, Mrs. Scott. Your Honor, I'd first like to address the question of the structural or functional differences between the cells of the prior art Bolin from a healthy animal and that Engelman claims. The examiner never made any rejection that those claims, that those cells were the same or that there wasn't anything sufficiently different, so we never had an opportunity to flesh out the record on that. But we have pointed out that the prior art cells were splenic and the ones Engelman used were from blood. And we have pointed out in the record the differences in maturity. They look different, they're younger, they don't have the dendrite-like projections, and the implications of that for the immature cells take up the antigen more carefully. Had we had that rejection, as you said, there was no 102, perhaps we would have put in more evidence on that point. Secondly, while the PTO says that with respect to Young and Inaba, they're talking about a therapy and this is a claim to a composition of cells, and that is true, and we don't, the dependent claims claim a therapeutic use, but this only needs to activate T-cells. But this composition still needs to meet that functional limitation of being able to activate T-cells in the presence of a progressing tumor burden. And that's why that is relevant, and it only needs to go so far as the T-cells. And the evidence in the record is that the T-cells were the victims of suppression by the suppressor cells emitted by the tumors. In fact, Young and Inaba talks about studies, and this is in 1996, studies have in fact demonstrated that CD4 plus lymphocytes, those are white blood cells, can actively suppress cell-mediated immunity under conditions of high T-cells. So what is it about the prior art that shows that there's a difference between healthy T-cells and the sick T-cells? That was never put at issue too, but it is well accepted. And I think that lies at the crux of the case, doesn't it? That the T-cells are suppressed in the presence of a tumor. Yeah, see, there's a whole chain of immune events. There's the dendritic cells that could be suppressed by the tumor. They then have to activate the T-cells that could have been affected. And all of those ingredients were together in the sick patient before the dendritic cells were harvested, but it didn't work. Something was broken. In taking those dendritic cells out, were they going to be resuscitatable? Who knew? Were they then, even if so, going to be able to affect the T-cells that had been in that environment where they'd been with them before? There was no expectation that that was going to work. The prior art did not teach working in the face of a tumor burden. Nobody had. This was the first investigation in vivo in the presence of a progressing tumor burden, or any tumor burden, for that matter. Okay, I think we're out of time. Thank you, Ms. Minkoff. Thank you, Ron. Thank both counsel. The case is submitted.